S. Chase Means (SBN 349032)
chase.means@gtlaw.com
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586.7700

Marc T. Rasich (SBN 174683)
marc.rasich@gtlaw.com
Bryan Hanks (*pro hac vice forthcoming*)
bryan.hanks@gtlaw.com
GREENBERG TRAURIG, LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478.6900

Attorneys for Plaintiff
Fire & Flood Emergency Services Ltd.

# IIN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| FIRE & FLOOD EMERGENCY SERVICES LTD. and FIRE AND FLOOD EMERGENCY SERVICES USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WILDFIRE WATER SOLUTIONS, INC. <br><br> Defendant, | Civil Action No. 2:26-cv-03938 <br><br> **COMPLAINT FOR PATENT INFRINGEMENT** <br><br> JURY TRIAL DEMANDED |

COMPLAINT

Plaintiffs Fire & Flood Emergency Services Ltd. and Fire and Flood Emergency Services USA, Inc. (collectively "Fire & Flood") bring this Complaint against Defendant Wildfire Water Solutions, Inc. ("WWS") and respectfully allege the following:

## I.  NATURE OF THE ACTION

1.  This case arises from WWS's infringement of U.S. Patent No. 12,533,537, which protects Fire & Flood's patented high-volume fire suppression systems and deployment processes used to increase humidity and protect communities and critical infrastructure from wildfires.

2.  This is a civil action arising under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*

3.  Fire & Flood also seeks temporary, preliminary, and permanent injunctive relief to prevent further infringement of the '537 Patent; compensatory damages adequate to compensate for WWS's infringement, including at least a reasonable royalty and, where applicable, lost profits; enhanced damages for willful infringement under 35 U.S.C. § 284; an accounting of infringing sales and revenues; attorneys' fees, costs, and expenses under 35 U.S.C. § 285; pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

## II.  THE PARTIES

4.  Plaintiff Fire & Flood is a corporation organized under the laws of Canada, with principal places of business in Red Deer County, Alberta, Canada and Kamloops, British Columbia, Canada.  Fire & Flood maintains continuous California operations through its wholly owned U.S. subsidiary, headquartered at 1320 E. Los Angeles Ave., Shafter, CA, 93263.

5.  Upon information and belief, Defendant WWS is a corporation that is incorporated in the State of Oregon and has its principal place of business at 1900 NE 3rd Street, Suite 106 #3115, Bend, OR 97701.

2
COMPLAINT

### III.   JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the patent laws of the United States (35 U.S.C. §§ 1 *et seq.*).

7.     This Court has personal jurisdiction over WWS because, among other reasons, WWS has conducted business and committed acts of infringement in this District, including promoting and deploying the accused fire suppression systems in connection with an urban deployment demonstration for Los Angeles City and Los Angeles County, and, on information and belief, WWS continues to market and offer the accused systems for use in this District and elsewhere in the United States.

8.     Venue is proper in this District under 28 U.S.C. § 1400(b) because WWS has committed acts of infringement in this District and, upon information and belief, has a regular and established place of business in this District in connection with the accused systems.  WWS, according to the home page of its own website (www.wildfirewater.com), maintains a location within this District in Los Angeles, CA.[1]  WWS also has an ongoing presence in this District to demonstrate, market, offer for sale, contract for, and deploy the accused fire-suppression systems for Los Angeles-area public agencies and stakeholders, including a July 31, 2025 demonstration for the Los Angeles Department of Water and Power, LA County Fire Department, and LA County Department of Public Works,[2] a subsequent August 6, 2025 emergency-response engagement with the City of Los Angeles,[3] and ongoing Los Angeles-area commercial activity directed to additional agency work.[4]  Upon information and belief, these activities are not isolated or sporadic, but instead reflect a continuing and established business presence in this District alongside WWS's regular and established place of business in this District, which is the principal locus of WWS's accused commercial operations.

---

[1] https://www.wildfirewater.com/ (last accessed 4.13.2026, Exhibit A, p. 9)
[2] https://ladwp.foleon.com/palisades/recoveryandresilience/advancing-partnerships (last accessed 4.13.2026; Exhibit B)
[3] *Id.*
[4] *Id.*

3
COMPLAINT

## IV.    PATENT-IN-SUIT

9.    On January 27, 2026, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 12,533,537 (the "'537 Patent"), entitled "Fire Suppression System and Process for Deployment."  A true and correct copy of the '537 Patent is attached hereto as Exhibit C.

10.    Fire & Flood Emergency Services Ltd. is the owner and assignee of all right, title, and interest in and to the '537 Patent, and Fire and Flood Emergency Services USA Inc. is the exclusive licensee within the United States, including the right to enforce the '537 Patent and recover damages for past and ongoing infringement.

11.    The '537 Patent generally relates to large-scale fire suppression systems and deployment processes, including systems that increase humidity for fire suppression using, inter alia, large-diameter layflat hose, adapters supporting one or more water-dispensing devices, and staged pumping to maintain pressure at the dispensing devices.

12.    The '537 Patent is valid and enforceable, and Fire & Flood has complied with all applicable statutory requirements to maintain the '537 Patent in full force and effect.

13.    Fire & Flood has standing to bring this action and seek all available remedies for infringement of the '537 Patent under the patent laws of the United States.

## V.    FACTUAL ALLEGATIONS

### Technology Background

14.    Wildfires are becoming extensively more devastating.  Areas which are particularly susceptible to wildfires have a lack of rainfall, extreme heat, wind, hills, slopes, abundance of trees, dry arid conditions and an array of dry fuel sources comprising homes with roofs made up by wood that are located in close proximity to forested areas.

15.    Since its founding, Fire & Flood's team, drawing on deep experience in large-scale fluid management and high-volume water transfer, has tested and deployed scalable high-flow, high-pressure water systems to support rapid response, quick setup, and sustained water delivery for all-hazard emergency operations.

COMPLAINT

16. Fire & Flood developed and patented an all-hazard, high-volume mobile hydrant system designed to rapidly move and dispense large volumes of water in challenging conditions. As described in the '537 Patent, the technology leverages large-diameter layflat hose segments deployed from reels, connected in-line over substantial distances, and integrated with adapters and one or more pumps staged along the line to maintain operating pressure at water-dispensing devices.

17. The '537 Patent further describes, among other features, the use of adapters placed at fixed locations to connect hose segments and to support one or more water-dispensing devices (including high-flow devices such as irrigation guns and portable monitors), with optional branch conduits for localized point protection, auxiliary water sources, or additional dispensing devices. These configurations enable creation of continuous or overlapping humidified zones to protect vegetation, structures, and critical infrastructure.

## WWS's Fire Suppression Systems

18. Over the past several years, WWS has used and promoted large-diameter, high-volume water transfer and fire suppression systems that deploy long runs of layflat hose supported by staged pumping and high-flow water-dispensing devices. WWS has continued to market these capabilities as a tactical, mobile, rapid-deployment solution for wildfire and emergency response, including through public demonstrations and ongoing outreach to agencies and potential customers in the United States.

19. For example, on or about August 17, 2024, a wildfire known as the "Mud Fire" was discovered near the Klamath Marsh National Wildlife Refuge in Klamath County, Oregon. Within 24 hours, the Mud Fire reportedly expanded from approximately one acre to about 22.3 acres due to high winds and dry fuels. The Mud Fire was managed by the South Central Oregon Fire Management Partnership, which includes the Oregon Department of Forestry, the U.S. Forest Service (Fremont-Winema National Forest), and the Bureau of Land Management, with command handled through the Lakeview Interagency Fire Center coordinating ground crews and aerial support. WWS participated

in the Mud Fire response as a Type 2IA handcrew.  WWS's tasking included planning and deploying a large-volume hose lay, reported to be approximately 17 miles of 10-inch hose, using large pumping platforms to deliver substantial water to areas inaccessible by traditional hose deployment methods.  WWS's team, including a 24-person Type 2IA handcrew and specialty tracked equipment, reportedly completed the hose lay and water delivery system and pumped an average of approximately 750,000 gallons of water per day through the 17-mile hose lay at a reported rate of about 1.5 miles per hour, as shown in Figure 1.

**Figure 1[5]**

20.    WWS has represented that this approach outperformed prior strategies relying on multiple Type 3 engines, Mark-3 pumps, and water tenders, and that WWS further rerouted approximately six miles of hose within a 12-hour period to address private landowner constraints.  WWS has also represented that, during a separate 2024 fire event

---

[5] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

at the Klamath Marsh Wildlife Refuge, its deployment helped limit what was described as a potential 25,000-acre threat to approximately 25 acres.

21. WWS has continued to actively market and offer similar large-diameter hose fire suppression systems featuring mounted high-flow water-dispensing devices and staged pumping. Among other activities, WWS conducted or participated in an "Urban Deployment Demo" in the Los Angeles area, in which WWS demonstrated a system using layflat hoses up to 16 inches in diameter and pump capabilities reportedly up to 375 psi. WWS has described that demonstration as including approximately 2.1 miles of 10-inch and 6-inch layflat hose, deployment on terrain of up to approximately 48% slope and more than 500 feet of elevation gain, two helicopter dip tank sites, customized perimeter point protection, a water-tender fill station, and ten high-volume monitors, deployed and fully operational in under five hours.[6]

22. Upon information and belief, WWS's Los Angeles-area activities are ongoing and commercially significant. For example, according to the Los Angeles Department of Water & Power (LADWP) website, "LADWP is pursuing a one-year $5 million contract with WWS, with the option to renew for up to two additional years to provide equipment in case of a major water outage or when backup support using high pressure pumps and hoses may be needed.[7] This prospective arrangement further evidences WWS's ongoing offer for sale, commercial promotion, and anticipated continued deployment of the accused systems in the United States, including in this District.

23. Consistent with these demonstrations and deployments, WWS's marketing materials describe tactical, mobile, rapid-deployment water delivery systems using proprietary diesel transfer pumps (including automated and remotely monitored features), high-volume, high-pressure water delivery hose (including 4-inch to 10-inch hose), aggregation of water from multiple sources, mobile above-ground storage tanks and related portable storage solutions, and networked monitoring and control.

---

[6] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D).
[7] https://ladwp.foleon.com/palisades/recoveryandresilience/advancing-partnerships (last accessed April 13, April, 2026; Exhibit B).

COMPLAINT

24.     On February 16, 2026, Fire & Flood, through counsel, provided WWS with notice of Fire & Flood's rights under U.S. Patent No. 12,533,537, which issued on January 27, 2026.

## Equitable Harm

25.     WWS's continued infringement has caused and, unless enjoined, will continue to cause Fire & Flood immediate and irreparable harm for which there is no adequate remedy at law.  Among other things, WWS's infringing activities threaten to erode Fire & Flood's market position, impair Fire & Flood's relationships with current and prospective customers and public agencies, diminish the value of Fire & Flood's patented technology, and cause loss of goodwill, business opportunities, and competitive advantage in the market for high-volume wildfire suppression and protection systems.  These injuries are difficult to quantify fully in monetary terms and cannot be adequately compensated by damages alone.  Absent temporary, preliminary, and permanent injunctive relief, WWS will likely continue its infringing conduct and continue to cause irreparable injury to Fire & Flood.  The balance of hardships favors Fire & Flood because any hardship to WWS would arise only from being required to cease unlawful infringement.  The public interest favors enforcement of valid patent rights and the prevention of unfair competition arising from infringement.

## Infringement Allegations

26.     Based on WWS's public statements, marketing materials, demonstrations, and deployments, WWS has made, used, offered for sale, and/or sold in the United States a fire suppression system that practices each limitation of at least claims 1-5 of the '537 Patent.  In particular, WWS has promoted systems utilizing large-diameter layflat hose forming a main water transfer line and a fire suppression line, adapters/manifolds deployed along the line with water-dispensing devices mounted thereon to provide continuous dispensing coverage, and staged inline and/or branch pumping to maintain operating pressure at the dispensing devices.

COMPLAINT

27. Accordingly, and as detailed in the element-by-element mapping below, WWS's accused systems infringe at least claims 1-5 of the '537 Patent. Fire & Flood alleges literal infringement to the extent the evidence shows each claim limitation is met as written. In the alternative, to the extent WWS contends that any accused feature does not literally satisfy a particular claim limitation, Fire & Flood alleges that such feature satisfies that limitation under the doctrine of equivalents because any differences are insubstantial and the accused feature performs substantially the same function, in substantially the same way, to achieve substantially the same result. The asserted claims recite:

28. Claim 1 recites "[a] system for increasing humidity for fire suppression, the system comprising: a main water transfer line having an inner diameter of at least about 8 inches (about 20 cm), a fire suppression line in water transfer communication with the main water transfer line, the fire suppression line formed of a plurality of polymer-comprising layflat hoses each having a length of about 150 meters to about 250 meters and having an inner diameter of at least about 8 inches (about 20 cm), wherein the layflat hoses are connected to each other using an adapter with a water dispenser mounted thereon, thereby providing a plurality of adapters and water dispensers along the fire suppression line to prevent lapse of water dispensing coverage; and one or more inline pumps and/or branch line pumps for boosting water pressure in the fire suppression line to provide water pressure at each water dispenser of at least about 80 psi (about 550 kPa).

29. Claim 2 recites "[t]he system of claim 1, wherein the adapter includes one or more connection points for connection of one or more branch lines."

30. Claim 3 recites "[t]he system of claim 2, wherein one or more of the branch lines is connected to a branch line water dispenser or to one of the one or more branch line pumps."

31. Claim 4 recites "[t]he system of claim 1, wherein the layflat hoses are arranged on reels carried by a vehicle and configured to be unspooled therefrom to form the fire suppression line."

COMPLAINT

32.    Claim 5 recites "[t]he system of claim 1, wherein the water dispenser of the adapters is an irrigation gun."

33.    The following element-by-element analysis maps WWS's accused systems to claims 1-5 of the '537 Patent.  Based on WWS's public statements, marketing materials, videos, and documented demonstrations and deployments, Fire & Flood contends that WWS's systems satisfy each limitation of claim 1 as set forth below.[8]

34.    **Claim 1: "A system for increasing humidity for fire suppression"**

35.    WWS makes, uses, offers for sale, sells, and/or imports a system for increasing humidity for fire suppression.  WWS publicly markets, demonstrates, and deploys its accused systems as wildfire suppression and structure-defense solutions intended to wet fuels/vegetation and protect assets during active fire events.  WWS itself describes its mission in these terms: "We provide reliable, high-volume water delivery to combat critical wildfires nationwide."[9]  In operation, WWS's systems deliver high volumes of water through large-diameter hose and disperse that water via high-flow water-dispensing devices over wide areas (including sustained, overlapping spray coverage).  This dispersion necessarily increases ambient moisture and localized humidity in the protected area and is used in connection with fire suppression and wildfire defense.  Accordingly, WWS's accused systems meet this limitation of claim 1.

36.    **"the system comprising: a main water transfer line having an inner diameter of at least about 8 inches (about 20 cm)"**

37.    WWS's accused systems include **a main water transfer line having an inner diameter of at least about 8 inches (about 20 cm).**.  WWS has publicly described deploying long runs of 10-inch layflat hose as the backbone of its water delivery operations, including a reported approximately 17-mile 10-inch hose lay on the Mud Fire, through which WWS reportedly pumped substantial volumes of water.[10]  *See* Figure 2.

---

[8] This mapping is illustrative and not exhaustive; Fire & Flood expects that additional discovery will further confirm infringement and may identify additional infringing implementations and claims.
[9] https://www.wildfirewater.com/ (last accessed April 13, 2026; Exhibit A)
[10] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

WWS has also described deploying large-diameter layflat hose in connection with its Los Angeles "Urban Deployment Demo," including approximately 2.1 miles of 10-inch (and additional 6-inch) layflat hose and, in some descriptions, layflat hose diameters up to 16 inches.  Because WWS's main water transfer line includes at least 10-inch layflat hose (and in some deployments reportedly larger), it meets this limitation of claim 1.



**Figure 2[11]**

38.    **"a fire suppression line in water transfer communication with the main water transfer line, the fire suppression line formed of a plurality of polymer-comprising layflat hoses each having a length of about 150 meters to about 250 meters and having an inner diameter of at least about 8 inches (about 20 cm)"**

39.    WWS's accused systems include a downstream suppression segment (i.e., a "fire suppression line") that receives water from, and remains in fluid communication with, WWS's primary water transfer hose lay.  As WWS deploys large-diameter layflat hose from a water source to the operational area and then continues that hose network through the suppression area to supply high-flow water-dispensing devices used for wildfire defense, water delivered through the main water transfer line flows directly into and supplies the fire suppression line, placing the two in water transfer communication.

[11] *Id.*

WWS's fire suppression line is formed from multiple coupled sections of layflat hose, and WWS has publicly described deploying large-diameter layflat hose (including 10-inch hose) in its operations, satisfying the claimed "inner diameter of at least about 8 inches" requirement. Further, WWS's layflat hose is deployed from reels in standardized section lengths and connected end-to-end over substantial distances, with individual hose sections falling within the claimed range (about 150 meters to about 250 meters) and collectively forming the continuous fire suppression line. *See* Fig. 1 below.

40. WWS's accused systems use "polymer-comprising" layflat hose as recited in claim 1. Layflat water-transfer hose of the type WWS deploys (including large-diameter hose used for long-distance, high-volume pumping and rapid deployment from reels) is, by standard commercial construction, manufactured from polymer-based materials, including a woven synthetic polymer jacket (e.g., polyester/nylon) and a polymeric liner and/or coating (e.g., polyurethane, PVC/nitrile, or similar). WWS's publicly available videos and photographs depict typical layflat water-transfer hose consistent with these commercially available polymer-comprising constructions. Accordingly, the layflat hoses used in WWS's systems meet this limitation of claim 1.



**Figure 3[12]**

---

[12] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

41. **"wherein the layflat hoses are connected to each other using an adapter with a water dispenser mounted thereon, thereby providing a plurality of adapters and water dispensers along the fire suppression line to prevent lapse of water dispensing coverage;"**

42. As shown in Figure 4, WWS deploys "distribution boxes" (also referred to as manifolds) in-line along its layflat hose runs. These distribution boxes are the claimed "adapter[s]" because they are positioned at fixed locations to connect upstream and downstream segments of layflat hose while providing one or more additional connection points for controlled water flow to dispensing equipment. The figures further show that WWS mounts high-flow water-dispensing devices (e.g., portable monitors/water cannons) at, or in direct water-transfer communication with, these distribution boxes such that water delivered through the connected layflat hoses is dispensed from the mounted devices at those adapter locations. By deploying multiple distribution boxes and corresponding water dispensers spaced along the fire suppression line, WWS provides repeated dispensing points that create overlapping spray coverage and prevent gaps (i.e., "prevent lapse of water dispensing coverage") along the protected corridor. Accordingly, WWS's accused fire suppression system meets this limitation of claim 1.

COMPLAINT



**Figure 4**[13]

43.    **"and one or more inline pumps and/or branch line pumps for boosting water pressure in the fire suppression line to provide water pressure at each water dispenser of at least about 80 psi (about 550 kPa)."**

44.    WWS's accused systems include one or more inline pumps and/or branch line pumps for boosting water pressure in the fire suppression line to provide water pressure at each water dispenser of at least about 80 psi (about 550 kPa).  This belief is supported by (i) WWS's publicly reported high-throughput, long-distance pumping operations over large-diameter layflat hose, which necessarily require staged pumping to maintain usable nozzle pressure at downstream dispensing points (*see* Figure 5), and (ii) WWS's own videos depicting sustained, coherent, high-energy streams from multiple high-flow monitors/"cannons" with significant throw and impact, which are characteristic of nozzle pressures at or above the claimed threshold.  In other words, the observable performance

---

[13] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

of WWS's dispensing devices in operation, together with the scale of the system's reported flow delivery and the need to overcome friction losses over long hose runs, shows that WWS boosts water pressure in the fire suppression line to deliver at least about 80 psi at each water dispenser.  WWS's accused systems meet this limitation of claim 1.



**Figure 5[14]**

45.    **Claim 2: "The system of claim 1, wherein the adapter includes one or more connection points for connection of one or more branch lines."**

46.    Upon information and belief, WWS's in-line "distribution boxes"/manifolds include multiple additional outlet ports (connection points) beyond the main in-and-out connections used to couple the layflat hose segments.  *See* Figure 6.  As reflected in WWS's system configurations and visuals of the distribution boxes, these connection points are used to attach one or more auxiliary hoses branching off the main line to supply additional equipment or downstream locations, thereby satisfying claim 2's requirement that the adapter includes one or more connection points for connection of one or more branch lines.

---

[14] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT



**Figure 6[15]**

47.    **Claim 3.  The system of claim 2, wherein one or more of the branch lines is connected to a branch line water dispenser or to one of the one or more branch line pumps.**

48.    Upon information and belief, WWS uses branch lines extending from the connection points on its distribution boxes/manifolds to feed additional water-dispensing devices and/or auxiliary pumping arrangements.  WWS's described deployments and demonstrations include point-protection and auxiliary supply features (e.g., perimeter point protection, fill stations, and additional dispensing locations) that are implemented by routing water from a manifold connection point through a branch hose to a downstream dispenser (e.g., a monitor/cannon) and/or to pumping equipment used to boost or manage pressure/flow to those branch-fed devices, thereby satisfying claim 3.  *See* Figures 4 and 6.

---

[15] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

**49.    Claim 4.  The system of claim 1, wherein the layflat hoses are arranged on reels carried by a vehicle and configured to be unspooled therefrom to form the fire suppression line.**

50.    Upon information and belief, and as shown in Figure 7, WWS deploys large-diameter layflat hose using vehicle-supported reels or reel systems configured for rapid, long-distance installation.  This belief is supported by the scale and speed of WWS's described hose-lay operations (including multi-mile hose deployment over rugged terrain and rapid rerouting) and by WWS's marketing and field-deployment videos showing mechanized, vehicle-assisted deployment practices consistent with reel-based unspooling of layflat hose to form the suppression line.



**Figure 7[16]**

**51.    Claim 5.  The system of claim 1, wherein the water dispenser of the adapters is an irrigation gun.**

52.    Upon information and belief, WWS's distribution boxes/manifolds are used as fixed connection points along the line to supply high-flow, wide-coverage water-dispensing devices mounted at or immediately adjacent to the adapter locations, including irrigation-gun type devices (i.e., rotating, high-flow water cannons used for broad outdoor

---

[16] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

coverage). *See* Figure 8. WWS's public materials describe and depict multiple high-volume "monitors" or "cannons" deployed along the hose line to generate large-area wetting/humidification, and at least some of those deployed devices are irrigation guns within the meaning of claim 5.



**Figure 8[17]**

## VI.    CAUSES OF ACTION

**COUNT I: DIRECT PATENT INFRINGEMENT (35 U.S.C. § 271(a))**

53.    Fire & Flood incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. The '537 Patent is valid and enforceable, and Fire & Flood is the owner of all right, title, and interest in the '537 Patent, including the right to enforce the '537 Patent and to recover for past and ongoing infringement. WWS has directly infringed and continues to directly infringe one or more claims of the '537 Patent, including at least claims 1-5, by making, using, offering to sell, and/or selling within the United States, and/or importing into the United States, accused systems and services that

---

[17] https://www.wildfirewater.com/our-results/ (last accessed April 13, 2026; Exhibit D)

COMPLAINT

meet each and every limitation of one or more asserted claims of the '537 Patent, either literally or, in the alternative, under the doctrine of equivalents. To the extent WWS contends that any accused product, system, component, or aspect of operation does not literally satisfy a particular claim limitation, Fire & Flood alleges that such limitation is satisfied under the doctrine of equivalents because any differences are insubstantial. Fire & Flood reserves the right to identify additional literal infringement and/or infringement under the doctrine of equivalents based on information obtained through discovery. WWS's infringement has injured Fire & Flood, and Fire & Flood is entitled to recover damages adequate to compensate for WWS's infringement, together with injunctive relief, interest, and costs as provided by law.

54. On information and belief, WWS has infringed the '537 Patent willfully. WWS has been on notice of the '537 Patent and Fire & Flood's infringement claims and has nevertheless continued its infringing conduct.

55. Unless enjoined by this Court, WWS's acts of infringement will continue to cause Fire & Flood irreparable harm for which there is no adequate remedy at law. Fire & Flood is therefore entitled to temporary, preliminary, and permanent injunctive relief under 35 U.S.C. § 283 and Rule 65 of the Federal Rules of Civil Procedure.

56. Fire & Flood is entitled to enhanced damages pursuant to 35 U.S.C. § 284. Furthermore, this case is exceptional within the meaning of 35 U.S.C. § 285, and Fire & Flood is entitled to recover its reasonable attorneys' fees, costs, and expenses.

**COUNT II — INDUCED PATENT INFRINGEMENT (35 U.S.C. § 271(b))**

57. Fire & Flood incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. On information and belief, WWS has actively induced and continues to induce infringement of the '537 Patent by others, including customers, end users, and entities with whom WWS performs demonstrations and deployments, by promoting, marketing, instructing, supplying, and/or providing assistance regarding the accused systems and their use in an infringing manner. On information and belief, WWS knew of the '537 Patent and Fire & Flood's rights therein and,

19

COMPLAINT

notwithstanding such knowledge, specifically intended to cause, and has caused, acts that constitute infringement of the '537 Patent. As a result of WWS's inducement, third parties have infringed and continue to infringe one or more claims of the '537 Patent.

58. Fire & Flood has been damaged by WWS's induced infringement and is entitled to recover damages, including at least a reasonable royalty, together with interest and costs as provided by law.

**COUNT III — CONTRIBUTORY PATENT INFRINGEMENT (35 U.S.C. § 271(c))**

59. Fire & Flood incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. On information and belief, WWS has contributorily infringed and continues to contributorily infringe the '537 Patent by selling, offering to sell, importing, and/or supplying within the United States components, assemblies, and/or system configurations that constitute a material part of the inventions claimed in the '537 Patent and are especially made or especially adapted for use in an infringing system. On information and belief, the components and configurations supplied by WWS for use in the accused systems are not staple articles or commodities of commerce suitable for substantial non-infringing use, and WWS knew that such components and configurations were especially made or adapted for use in infringement of the '537 Patent.

60. Fire & Flood has been damaged by WWS's contributory infringement and is entitled to recover damages, including at least a reasonable royalty, together with interest and costs as provided by law.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fire & Flood Emergency Services Ltd. respectfully requests that the Court enter judgment in its favor and against Defendant Wildfire Water Solutions, Inc., and award the following relief:

1. A judgment that WWS has infringed the '537 Patent, literally and/or under the doctrine of equivalents;

2. A temporary, preliminary, and permanent injunction pursuant to 35 U.S.C. § 283 and Rule 65 of the Federal Rules of Civil Procedure, enjoining WWS and its officers,

agents, servants, employees, attorneys, and all persons acting in active concert or participation with them from making, using, offering to sell, selling, and/or importing into the United States any product, system, service, or method that infringes the '537 Patent;

3.    An award of damages adequate to compensate Fire & Flood for WWS's infringement of the '537 Patent, in an amount to be proven at trial, but in no event less than a reasonable royalty pursuant to 35 U.S.C. § 284, together with lost profits, pre-judgment and post-judgment interest as permitted by law;

4.    An accounting of all infringing sales, uses, offers for sale, and revenues, and an award of supplemental damages for any continuing or post-verdict infringement up to the entry of final judgment;

5.    A finding that WWS's infringement is willful and an award of enhanced damages pursuant to 35 U.S.C. § 284;

6.    A finding that this is an exceptional case and an award of Fire & Flood's reasonable attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285;

7.    In the alternative, if injunctive relief is not granted, an award of an ongoing royalty for any post-judgment infringement of the '537 Patent in an amount to be determined by the Court; and

8.    Such further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

[*Signature Page Follows*]

COMPLAINT

DATED: April 13, 2026

Respectfully submitted,

/s/ *S. Chase Means*

S. Chase Means (SBN 349032)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586.7700
chase.means@gtlaw.com

Marc T. Rasich (SBN 174683)
Bryan Hanks (*pro hac vice forthcoming*)
GREENBERG TRAURIG, LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: 801-478-6900
marc.rasich@gtlaw.com
bryan.hanks@gtlaw.com

*Counsel for Plaintiffs Fire & Flood Emergency Services Ltd. and Fire and Flood Emergency Services USA, Inc.*

COMPLAINT